Pro Se Murad Clark

2355 Westwood Blvd

Los Angeles Ca 90064

(323) 907-5475

muradclark@gmail.com

FILED
Superior Court of California
County of Los Angeles

OCT 13 2020

Sherri R. Carter, Executive Officer/Clerk of Court
By _____ Deputy
Cristina Grijalva

# LOS ANGELES SUPERIOR COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MURAD CLARK,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LOS ANGELES: CITY OF LOS ANGELES POLICE DEPARTMENT, OFFICER COVARRUBIAS #42028, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS POLICE OFFICER; OFFICER ZAVALA #40197,INDIDVIDUALLY AND IN HIS COMPACITY AS A POLICE OFFICER; SERGEANT Christopher Burke #36665,INDIVIDUALLY AND IN HIS OFFICIAL COMPACITY AS A POLICE OFFICER and DOES 1 through 50, Inclusive<br><br>Defendants. | Case No:   20STCV30083<br><br>COMPLAINT FOR DAMAGES<br><br>1. VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. §1983;<br><br>2. VIOLATION OF TITLE VI OF CIVIL RIGHTS ACT OF 1964,42 U.S.C§ 2000D RACE DISCRIMATION IN A FEDERALLY FUNDED PROGRAMS;<br><br>3. VIOLATION OF THE FOURTH AND FOURTEENTH ADMENDMENTS 42 U.S.C. 1983;<br><br>4. VIOLATION OF COMMERCE CLAUSE,ARTICAL IV, AND 42 U.S.C §1983;<br><br>5. VIOLATION OF 42 U.S.C § 1983;<br><br>6.CONSPIRACY TO VIOLATE CIVIL RIGHTS 42 U.S.C. §§ 1985 AND 1986;<br><br>7. VIOLATION OF GOVERNMENT CODE SECTION 11135 AND 11139102;<br><br>8. VIOLATION OF ARTICLE 1, SECTION 13 OF THE CALIFORNIA CONSTITUTION;<br><br>9.VIOLATION OF CIVIL CODE SECTION 52.1(B);<br><br>10.INTENTIONALL INFLICTION OF EMOTIONAL DISTRESS;<br><br>11.FALSE IMPRISONMENT<br><br>12.NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.<br><br>DEMAND FOR JURY TRIAL |

1

Exhibit 1 - Page 9

## INTRODUCTION

1.      This is a civil rights action seeking declaratory, injunctive, and monetary relief against the CITY OF LOS ANGELES; CITY OF THE LOS ANGELES POLICE DEPARTMENT; OFFICER Zavala,  and OFFICER COVARRUBIAS FOR engaging in and condoning a continuing pattern and practice of race-based stops, detentions and searches of motorists of color, traveling on the public streets and highways of the State of California. The specific abuses giving rise to this action occurred on December 18, 2019 in the area of 1426 Channing St. Los Angeles, Ca 90021.

2.      Plaintiff in this case, Murad Clark ("Clark"), who has been subjected to the humiliation of being targeted, interrogated, detained and searched by defendants' LAPD in the area of Alameda and 14th St. due to the defendants' policy and practice of what is commonly known as "racial profiling." The moment Mr. Clark was approached by the defendants he became a victim of what the United States Court of Appeals for the Ninth Circuit called "an all too familiar set of circumstances- an intrusive law enforcement stop and seizure of innocent persons on the basis of suspicions rooted principally in the race of the 'suspect' as in the case of Washington v. Lambert, 98 F.3d 1181, 1182 (1996).

3.      To any person of color, regardless of ethnic background, level of education, or economic station in life, the insidious problem of racial profiling by law enforcement officers is all too familiar. It is a continuing reminder that, despite popular notions of progress in race relations, racial discrimination remains a day-to-day reality in our society. By the complaint in this case, plaintiff seek judicial redress for violations of his civil rights due to racial profiling and likewise seeks to confirm what everyone has a right to expect in the United States: that people of color may use the public

2

Exhibit 1 -  Page 10

of his civil rights due to racial profiling and likewise seeks to confirm that everyone has a right to expect in the United States: that people of color may use the public streets and highways, just like anybody else, without having to suffer the indignities of racial discrimination at the hands of government officials.

5.      Plaintiffs' claims are brought pursuant to the Fourth, Fifth and Fourteenth amendments of the United States Constitution; Title VI of the Civil Rights Act of 1964 and its implementing regulations, 42 U.S.C. § § 1982, 1983,1985 and 1986; Article 1, Section 7(a) of the California Constitution; California Civil Code §52.1; California Government Code §§11135 and11139; and the California Common Law.

## JURISDICTION

6.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 2201. The Court has pendent jurisdiction and supplemental jurisdiction over the state law claims alleged in this complaint purruant to 28 U.S.C. §1367. Declaratory relief is authorized under 28 U.S.C. §§2201 and 2202.

7.      All administrative remedies have been exhausted. In compliance with California Government Code § 910 et seq., Mr.Clark has filed administrative claims for damages under the California Tort Claims Act with the California State Board of Control: claim # C2004516

8.      A substantial part of the events giving rise to the claims alleged in this Complaint arose in the County of Los Angeles, California. Venue therefore lies in the United States District Court for the Southern District of California, Los Angeles Division,pursuant to 28 U.S.C.§84(a), 28 U.S.C. § 1391(b)(2) and Civil Local Rule 2(d).

## PARTIES

9.      Plaintiff Murad M. Clark is, and at all relevant times herein mentioned

3

Exhibit 1 -  Page 11

was, a citizen of the State of California and a resident of the County of Los Angeles. Mr.Clark is of African American decent and, by physical appearance,is a person of color.

10.    Upon information and belief, Defendant CITY OF LOS ANGELES (hereafter " CITY"), is and was at all times herein mentioned, a municipal corporation dually organized and existing under and by virtue of the laws of the State of California and is the public employer of the police officers named herein as defendants in this action.

11.    Upon information and belief,the LAPD receives federal funds through federal grants from the United States department of Justice or another Federal agency. As such, the LAPD is legally required to conduct its activities in a racially non-discriminatory manner.

12.    Upon information and belief, Defendant CITY OF LOS ANGELES POLICE DEPARTMENT, hereinafter ("LAPD"), is and was at all times herein mentioned, a public entity, duly organized and existing under and by virtue of the laws of the State of California and is the public employer of the police officers named herein as defendants' in this action. Said defendant CITY OF LOS ANGELES POLICE DEPARTMENT can be sued separately under Shaw v. State of California department of alcoholic beverage control 788 F.2d 600 605 (9th circuit.1986; Doggett v. United States 858 f. 2D 555, (9th cir. 1988) streit v. County of Los Angeles 236 f. 3D 552, 557 (9th Cir. 2001).

13.    Upon information and belief, defendant Doe Officer ZAVALA #40197, (hereinafter " Zavala"), sued here in both his individual and offiical capacities is and was at all relevant times, a police officer employed by defendants CITY and LAPD and operated within the borders and boundaries of

4

Exhibit 1 -  Page 12

the city of Los Angeles in his official capacity. Defendant ZAVALA acted within the course and scope of his employment as a sworn police officer and responsible for among other things, implementation of the customs, policies, practices and or procedures and was acting under the color of state law as an employee, agent, and representative of defendants CITY and LAPD. In due course, this complaint will be amended to allege the full and correct name of Doe defendent officer Zavala once that information is ascertained.

14.     Plaintiff sues Doe defendant Zavala in his individual and official capacity as an active participant in, or alternatively, as a bystander official who willingly failed to intervene to protect plaintiff from, the violations alleged herein.

15.     Upon information and belief, Doe defendant officer COVARRUBIAS, hereinafter ("COVARRUBIAS"),sued here in both his individual and official capacities was at all relevant times, a police officer employed by defendant City and LAPD and operated within the borders and boundaries of the City of Los Angeles in his official capacity. Defendant Covarrubias acted within the course and scope of his employment as a sworn police officer and responsible for among other things, implementation of the customs, policies, practices and or procedures and was acting under color of state law as in employee, agent, and representative of defendants City and LAPD.In due course,this complaint will be amended to allege the full and correct name of Doe defendent officer Covarrubias once that information is ascertained.

16.     Plaintiff sues Doe defendant Covarrubias in his individual and official capacity as an active participant in, or alternatively, as a by standing official who willingly failed to intervene to protect plaintiff from the violations alleged herein.

17.     Upon information and belief, Defendant Sgt Christopher Burke

5

Exhibit 1 -  Page 13

(Hereinafter "Burke"), sued here in both his individual and official capacities is and was at all relevant times, a Sgt employed by defendant City and LAPD and operated within the borders and boundaries of the city of Los Angeles in his official capacity.

18.    Upon information and belief, defendent Sgt Christopher Burke is a Sgt for LAPD and a resident of California.Upon information and belief, Sgt Burke of the LAPD directly or indirectly participated in the authorization,planning and supervison of the actions of the individual LAPD officers involved in this case,including Doe defendents Zavala and Covarrubias.Upon information and belief, defendent Burke failed adequately to train LAPD personnel under his supervision and to promulgate appropriate policies to prevent race-based vehicular stops, and has established, implemented and enforced illegal and unconstitutional policies and practices that have caused plaintiff's injuries.

19.    Plaintiff is informed and believes that Doe defendants 1 through 50 are all officers or supervisors of the LAPD and were at all relevant times acting in the course and scope of their employment and acting under the color of law. Upon information and belief, plaintiff is informed and believes that Doe defendants 1 through 50 are all officers of the LAPD and were at all relevant times acting in the course and scope of their employment and acting under color of law. Upon information and belief, each of Doe defendants 1 through 50 participated in some way in the stop and search of plaintiff on the basis of race,ethnicity, or national origin. Doe defendants 1 through 50 are all sued in their individual and official capacities.The true names of these defendants are unknown to plaintiff. In due course, this complaint will be amended to allege the full and correct names when they have been ascertained.

6

Exhibit 1 -  Page 14

20.     Plaintiff is informed and believes that Doe defendants 1 through 50 are officials and/or supervisory officers of the LAPD and were at all relevant times acting in the course and scope of their employment. Upon information and belief, each of the Doe defendents 1 through 50 directly or indirectly participated in the authorization, planning and supervision of the actions of the individual LAPD officers involved in this case. Upon information and belief, one or more of these defendent failed adequately to train LAPD personnel and to promulgate appropriate policies to prevent race-based vehicular stops, and all of them have established, implemented and enforced illegal and unconstitutional policies and practices that have caused plaintiff's injuries. Doe 1 through 50 are sued in their individual and official capacities. The true names of these defendants are unknown to plaintiff; plaintiff will amend this complaint to identify these defendents' true names when they have been ascertained.

21.     Upon information and belief, at all relevant times each defendant was the agent and/or employee of each of the remaining defendants, and in doing the things herein alleged was acting within the course and scope of his or her employment and under color of law. Each of the defendants caused, and is responsible for, the unlawful conduct described herein. Each defendant is responsible for plaintiff's injuries by personally participating in the unlawful conduct; acting jointly and in concert with others who did so; authorizing, acquiescing or failing to take action to prevent the unlawful conduct; promulgating policies and procedures pursuant to which the unlawful conduct occurred; failing and refusing, with deliberate indifference, to implement and maintain adequate training and supervision; and/or by ratifying the unlawful conduct.

22.     All of the defendants, and each of them, are sued both in their individual and official capacities.

### THE ILLEGAL STOP AND SEARCH

7

Exhibit 1 -  Page 15

23.    On December 18, 2019, the Plaintiff was legally parked in a cul-de-sac at approximately 8:40 p.m. located at 1426 Channing St Los Angeles, CA 90021. Mr. Clark was at the wheel of his black colored 2019 Honda Odyssey parked stationary getting direction from his GPS device. The plaintiff was not blocking or obstructing any traffic or breaking any traffic laws (see exhibit A). While the plaintiff was getting directions, an LAPD patrol vehicle came southbound on channing street while the plaintiff was still parked stationery facing northbound on Channing St. Mr. Clark is a security officer.

24.    As defendant LAPD officers pulled alongside plaintiff's vehicle, officer COVARRUBIAS in the driver's seat shined a bright dome light located on the side of his patrol car into the driver side of the plaintiff's vehicle where he was located. When defendant LAPD Officer Covarrubias saw that the plaintiff was Black he along with two other LAPD officers immediately jumped out of the patrol car. To see what the problem was, plaintiff stepped out of his vehicle to speak with officers and was placed into handcuffs giving no initial reason for making contact with plaintiff.

25.    Shortly after plaintiff stepped out of his vehicle to see what the problem was, he was first approached by the defendant driver LAPD officer COVARRUBIAS who had his gun pointed at plaintiff as he jumped out of his patrol vehicle still facing southbound.

26.    Plaintiff was then taken to the rear of his vehicle where he was forced to stand facing a fence while defendant LAPD officers' searched plaintiffs vehicle even though plaintiff said he did not consent to any search.

27.    During this time, the plaintiff was subjected to random questioning for an extended period of time while handcuffed and unable to move freely. In total, there were

8

Exhibit 1 -  Page 16

three defendant LAPD officers'. One unidentified officer was questioning the handcuffed plaintiff while defendant LAPD officers COVARRUBIAS and officer ZAVALA conducted the unlawful search and seizure of plaintiff's personal property. During the search of plaintiff's vehicle, officer COVARRUBIAS became noticeably frustrated after not being able to find anything illegal in plaintiff's car. Defendant LAPD officer ZAVALA walked over to Plaintiff who was standing facing a fence to the rear of his vehicle, unbuckled his belt to look down his pants.

28.    Plaintiff informed defendant LAPD officers' several times that his equipment belt was left in a locker at his job so there are no guns or drugs in the vehicle. After scouring through the front and middle portion of plaintiff's vehicle, defendant LAPD officer ZAVALA, and officer COVARRUBIAS went to the back of plaintiffs vehicle opened his trunk then proceeded to remove all of plaintiff's personal property out onto the street (see exhibit B).

29.    The search defendant LAPD officers' undertook turned up nothing, however, the plaintiff noticed his missing Sony tablet that was located in the trunk of his vehicle in the exact area where the search was taking place. Moreover, plaintiff also realized after the search that $150 in US currency was missing from his glove compartment on the passenger side of his vehicle.  After a detention that lasted for two hours but may have been longer. Mr. Clark was released without a ticket or citation or a reason for the stop. His only "crime" it turned out, was being a black male.

30.    Mr. Clark was detained and searched without any legal basis, and have been shamed and demeaned by being forced to endure the humiliating questions and treatment from the officers who detained and searched him then seized his personal property.The actions of defendant LAPD officers, towards plaintiff Mr. Clark was a

9

Exhibit 1 -  Page 17

wanton violation and disregard of his constitutional rights against unlawful search and seizure. While it can be argued that the defendant officers are in the performance of their duty, I would like to reiterate that nothing in my actions would justify a warrantless search, except that to my good faith belief, that I was merely profiled and considered to be a suspect because of the fact that I am black.

31.     Mr.Clark travels on Alameda and throughout LAPDs patrol area for work-related reasons approximately once or twice a month. Mr. Clark has no intention of changing his job or his residence, and therefore has a reasonable expectation that he will travel these same streets in the future. Therefore, based on his stop, his observations of other stops coupled with the history of LAPD officers racially profiling and his needs to use those streets for business and personal reasons, Mr Clark has a valid and reasonable fear that he will be stopped by the LAPD again in the future solely on the basis of his race.

## LOS ANGELES POLICE DEPARTMENT RACIAL PROFILING

## HISTORY

32.     A recent study citing data regarding LAPDs long history of racial profiling shows that black drivers are more than four times as likely as whites to be searched during stops (see Exhibit C and D) In fact, Los Angeles Mayor Eric Garcetti reduced LAPD vehicle stops in response to racial discrimination allegations. February 7, 2019. The report, which was based on a review of thousands of LAPD records and testimony from numerous LAPD officers and officials, concluded that the LAPD discriminates against motorists of color in general and black motorist in particular.

33.     According to the report, the goal of defendant LAPD is to use intensified enforcement of traffic laws to generate a very high volume of traffic stops amongst the

10

Exhibit 1 -  Page 18

city's black population that's only 6% but account for 60.4% of those stops. Instead of improving the training and /or punish officers who violate the civil Rights of black motorist, LAPD is trained to stop and search thousands of motorists for insignificant vehicle code infractions, the vast majority of which result in no more than a verbal warning.

34.   As a matter of policy, officers are encouraged to use vehicle code violation such as weaving, improper lane change,burned-out license plate lights, tinted windows, following too closely or seatbelt violations as excuses to stop drivers and attempt to search their cars for drugs or guns.Once the officers have an excuse for the stop, they are trained to begin questioning and searching the occupants of the vehicle.

35.   The report indicated that the traffic stops LAPD carried out  based on racial profiling frequently resulted in travelers spending lengthy periods of time standing on the side of the road while being interrogated, fielding repeated questions about their family members, their occupation, their marital status, their immigration status, their criminal history and their recreational use of drugs or alcohol. Many of these motorists have their pulses taken to detect signs of nervousness, a trait which is then cited as grounds for requesting "consent" to search their car.Other motorists are subjected to field sobriety test even though there is no evidence that the motorist was under the influence of alcohol or a controlled substance.

36.   The LAPD has long relied upon race and ethnicity in conducting stops, detentions, interrogations and searches of motorist. They have engaged in an unabated, continuing pattern and practice of racial profiling.

37.   In recent years, the law enforcement practice of targeting motorist on the basis of race or ethnicity has increased dramatically nationwide. In addition, plaintiff

11

Exhibit 1 -  Page 19

believes LAPD is allowing and encouraging pretextual racial stops of black motorist. Racial profiling encourages officers to rely upon minor traffic violations that can be used as an excuse or pretext to stop motorist that somehow seem "suspicious". Once a stop has been made, officers are trained to seek consent to search-which most unwary motorists readily give-so that there is no need to point to any probable cause should questions about the legality of the search arise later. When consent is refused, police often detain the motorist.

38.     Studies indicate that most motorists do not even know they have the right to refuse consent to the search. Those who do know their rights have been violated are often so relieved that they're frightening encounter with police has ended without violence or arrests that they simply go on their way without complaint. Some motorists believes that complaining to law enforcement agencies about their illegal and discriminatory practices is futile. Others fear retaliation.

39.     The practice of stopping and searching innocent motorists would be alarming no matter who was subjected to this kind of treatment by government officials. The reality, however, is that motorists of color are targeted and subjected to these practices at grossly disproportionate rates. Defendant LAPD officers, consistent with their training, or determining who to stop, detain, interrogate and / or search in a racially discriminatory manner.

40.     As set forth by commissioner Steve Soboroff, the LAPD own figures show that between 30 and 60% of all motorists stopped by their department have been a member of minority group. This data strongly suggests that motorists are targeted, stopped and searched on the basis of race by the LAPD.

41.     The discriminatory impact of the LAPD's selective enforcement in terms of

12

Exhibit 1 -  Page 20

traffic stops and searches should not be justified by law enforcement necessity. Racial profiling operations have proven to be extremely costly and largely ineffective, taking a tremendous toll on thousands of innocent motorists every year.  According to the LAPD zone data the overwhelming majority of their searches turn up nothing incriminating. Statistical analysis performed in other states show that it is common for between 70 and 95% of all stops to produce no arrest or contraband seizures. As a result, thousands of innocent motorists stopped, searched and treated like criminals by the defendants every year based on nothing more than a police officers mistaken hunch.

42.     Defendant LAPD participation in racial profiling, in the proliferation of pretextual racial stops, training has occurred with the strong support of the City of Los Angeles. The report also found that individual officers involved in these discriminatory pretextual racial stops have been carrying out what they perceive to be the policy of the LAPD, and the administration of the State of California and targeting drivers through profiling. In fact, the officers involved in unlawful policies have been repeatedly commended by their superiors for the jobs they are doing and encouraged to continue with the stops despite the fact that the vast majority of the stops are unsuccessful and involve motorists of color.

43.     Officers are under considerable pressure by their supervisors to pull over as many motorists as possible and to conduct as many searches as possible, and therefore spend thousands of hours conducting unwarranted and intimidating stops of innocent motorists. Most of whom are black. Plaintiff alleges that LAPD and supervisors have been aware that officers are engaging in racial profiling, yet have failed and refused to stop it, thereby showing deliberate indifference to the rights of motorists of color. The supervisory defendants have failed to take effective action to prevent continuation of the egregious pattern of discrimination against black motorists, despite

13

Exhibit 1 -  Page 21

their rhetoric to the contrary. Due to the supervisory defendants' inaction, innocent drivers suffered and continue to suffer systemic violations of their civil rights.

44.     The racially discriminatory impact of selective enforcement based on race has been challenged in numerous cases nationwide. New Jersey judges have dismissed more than 600 criminal cases in recent years because of concerns over racial stereotyping by officers in the operation pipeline; the Maryland State Police has settled litigation challenging racial profiling and connection with their drug interdiction efforts; "racist assumption" about drivers who were being pulled over and searched for drugs in connection with their pipeline program.

45.     Defendants have turned a deaf ear to the racially imbalanced results of these pretextual traffic stops based on race, the complaints of victims, and the trauma these baseless stops and searches have on motorist of color in California. What happened to the plaintiff as described below, is not unusual. Their stories are consistent with the defendants' policy, pattern and practice of discriminating on the basis of race when determining whom to target, stop, interrogate, detain and / or search. The clear discriminatory effort of these practices, and the discriminatory purpose hidden behind the defendants' practice and policy of willful ignorance, is immoral and illegal. These practices must be stopped.

<u>Allegations</u>

46.     There are questions of law and fact because the plaintiff was adversely affected by the challenged actions of the defendants. Common questions of fact and law include, but are not limited to: whether LAPD officers' target, stop, detain and\or search individual drivers in a racially discriminatory manner; and whether LAPD officers' are knowingly trained to employ methods that result in racial profiling and have an

14

Exhibit 1 -  Page 22

unjustified disparate impact and plaintiff will be adversely affected by the challenged actions of defendant LAPD officers'.

47.    The claims of the plaintiff are typical of Black/African Americans who travel in the greater Los Angeles area and have been stopped, detained and / or searched by the defendents. The awful experience of the plaintiff at the hands of the defendant LAPD officers resulted from the defendants' City and LAPD's policy and practice of discriminating on the basis of race and ethnicity.

## REQUISITES FOR RELIEF

48.    As a direct and proximate result of the conduct of defendants LAPD and City described above, plaintiff has been denied his constitutional and statutory rights as stated below and has suffered and continues to suffer mental and emotional distress, humiliation, embarrassment, discomfort, anxiety and pain.

49.    Defendants' acts were willful, despotic, arbitrary, capricious, wanton, malicious, oppressive and done with conscious disregard and deliberate indifference for plaintiff rights. Therefore, defendants' LAPD and City actions justify an award to plaintiffs of punitive damages in an amount to be determined at trial.

50.    Defendants' policies, practices, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to plaintiff, including but not limited to further violations of his statutory and constitutional rights. Plaintiff has no other plain, adequate or complete remedy at law to address the wrongs described herein. Plaintiff therefore seek injunctive relief restraining defendants LAPD from continuing to engage in and enforce the unconstitutional and illegal policies, practices, conduct and acts described herein.

51.    Defendants' acted with discriminatory intent in violation of plaintiff's legal

15

Exhibit 1 -  Page 23

and constitutional rights, and have directly and proximately caused plaintiff's humiliation, mental pain, and suffering. As a direct, legal, and proximate result of defendants" violation of plaintiff's' statutory, constitutional and common law rights, plaintiff has been damaged in an amount which is not yet known. Plaintiff will seek leave of court to amend this complaint when ascertained, or will amend to conform to proof at time of trial.

52.     At all times herein mentioned, defendent LAPD and CITY had an obligation to comply with federal and state laws regarding racial discrimination. Defendants failed to meet these obligations with respect to the Plaintiff.

53.     Defendants acted with discriminatory intent in violation of plaintiff's legal and constitutional rights, and have directly in proximately caused plaintiff's humiliation, mental pain and suffering. As a direct, legal, and proximate result of defendants' violations of plaintiff statutory, constitutional and common law rights, plaintiff has been damaged in an amount which is not yet known. Plaintiff's will seek leave of court to amend this complaint when ascertained, or will amend to conform to proof at time of trial.

54.     At all times herein mentioned, defendant LAPD and city had an obligation to comply with federal and state laws regarding racial discrimination. Defendants failed to meet these obligations with respect to the Plaintiff.

**FIRST CAUSE OF ACTION**
**Race Discrimination in Federally Funded Programs**
**Title VI of the Civil Rights Act of 1964 and 42 C.F.R. §§ 101 *et seq.***
**(Against Defendants LAPD and CITY)**

55.     Plaintiff incorporates by reference and reallege paragraph 1 through 54 of this complaint.

56.     Title VI of the civil Rights act of 1964, 42 U.S.C. § 2000 d, provides:

16

Exhibit 1 -  Page 24

[N]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected discrimination under any program or activity receiving federal financial assistance.

57.     Federal regulations implementing title VI prohibit federally funded programs or activities from having a racially discriminatory impact or effect. The regulations provided that no program receiving financial assistance through the US Department of Justice shall:

*Utilize criteria or method of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin*

58.     Defendant LAPD receives federal financial assistance from the United States department of Justice, and thus is bound to abide by the terms of title VI and its implementing regulations, including 28 CFR section 42.101 et seq.

59.     The Eleventh Amendment immunity of the State of California, the LAPD was abrogated by Congress in its enactment of title VI. 42 USC section 2000d-7.

60.     Defendants LAPD and Cities violation of 42 USC section 2000 d and its implementing regulations have caused and will continue to cause plaintiff to suffer tremendous harm and public humiliation in that he has been made to endure and will continue to be subjected to LAPD and or the cities practice of race-based discrimination without judicial intervention.

## SECOND CAUSE OF ACTION
### Violation of the Fourteenth amendment and 42 U.S.C. §1983
**(Against all defendants in their individual and official capacities except LAPD and City)**

17

Exhibit 1 -  Page 25

61.     Plaintiff incorporates by reference and reallege paragraph 1 through 60 of the complaint.

62.     Defendants' acting under color of law and in concert with one another, have engaged in a continuing pattern and practice of intentional race discrimination and pretextual race based stops carried out in the greater Los Angeles area. In so doing, defendants' have caused plaintiff to suffer deprivation of his fundamental rights to liberty and to be free from unlawful searches, detentions and seizures on account of his race and/or national origin. These actions violated plaintiff's rights to equal protection of the laws, in violation of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. §1983.

63.     Defendants acting under color of law, institute, authorize, tolerate, ratify, permit and acquiesce in policies, practices and customs of the detention, searches and seizures which involved intentional race discrimination in the provision of law enforcement services.

64.     The defendant acts were done knowing the wanton violation of plaintiffs legal and constitutional rights, and have directly and proximately caused plaintiff's humiliation, mental pain, and suffering.

65.     Defendants acting under color of law, institute, authorized, tolerate, ratify, permit and acquiesce and policies, practices and customs of detention, searches and seizures which involved intentional race discrimination in the provision of law enforcement services.

66.     The defendants' acts were done knowing the wanton violation of plaintiff's legal and constitutional rights, and have directly and proximately caused plaintiff humiliation, mental pain, and suffering.

18

Exhibit 1 -  Page 26

### THIRD CAUSE OF ACTION
### VIOLATION OF THE Fourth and Fourteenth Admenments to the United States constitution
### 42 USC section 1983.
### (Against all defendants in their official and individual capacities except LAPD and CITY)

67.     Plaintiff incorporates by reference and reallege paragraphs 1 through 66 of this complaint.

68.     Defendants, acting under color of law in concert with one another, have violated plaintiff's rights to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution. Defendants have subjected plaintiff to lengthy detentions, interrogations and searches, without probable cause or reasonable suspicion to believe that any crime had been committed or that plaintiff was involved in any criminal activity, in violation of the Fourth Amendment guarantee against unreasonable searches and seizures, and giving rise to Plaintiff claim pursuant to the Fourteenth amendment and 42 U.S.C. § 1983.

69.     Defendants', acting under color of law, instituted, authorized, tolerated, ratified permit and acquiesced in policies, practices and customs of detentions, interrogations, searches and seizures without probable cause or reasonable cause, articulable suspicion of crime, in their provision of law enforcement services.

70.     Defendants' acts were done in knowing violation of plaintiffs' legal and constitutional rights, without good faith, and have directly and proximately caused plaintiff humiliation, mental pain and suffering.

### FOURTH CAUSE OF ACTION
### Violation of commerce clause, article IV,and Fourteenth amendment to the United States Constitution 42 USC section 1983.
### (against all defendants in their individual and official capacities except the LAPD and the City)

19

### Exhibit 1 -  Page 27

71.     Plaintiff incorporates by reference and reallege paragraph 1 through 70 of this complaint.

72.     Defendants, acting under color of law and in concert with one another, have caused plaintiff to be penalized and deterred in the exercise of his fundamental right to interstate travel and migration on account of his race and / or ethnicity and / or national origin. These actions violated plaintiffs right to travel, in violation of the commerce clause and the Privileges and the Immunities clause of Article IV and the Fourteenth Amendment.

73.     Defendants, acting under color of law, institute, authorize, ratify, permit and acquiesce in policies, practices and customs of detention,searches and seizures which violate plaintiff's fundamental right to interstate travel or migrate.

74.     Defendants' acts were done in known violation of plaintiffs legal and constitutional rights, without good faith, and have directly and proximately caused plaintiff humiliation, mental pain and suffering.


## FIFIFTH CAUSE OF ACTION
### Violation of 42 U.S.C. Section 1983
**(Against all defendants in their individual and official capacities except the LAPD and City)**

75.     Plaintiff incorporates by reference and reallege paragraphs 1 through 74 on this complaint.


76.     Defendants, acting under color of law and in concert with one another, have denied plaintiff his right to full and equal benefit of the laws and his right to be subject to like punishment under 42 USC section 1981.

20

Exhibit 1 -  Page 28

77.    Defendants, acts were the result of discriminatory intent, and were done in known violation of plaintiff's legal and constitutional rights, without good faith, and have directly and proximately caused plaintiff humiliation, mental pain and suffering.

## SIXTH CAUSE OF ACTION
### Conspiracy to Violate Civil Rights
### (42 U.S.C.§§ 1985 and 1986)
### ( Against All defendants except LAPD and CITY)

78.    Plaintiff incorporates by reference and reallege paragraphs 1 through 77 on this complaint.

79.    Defendants, acting under color of law and in concert with one another, and by way of a conspiracy among them, have caused plaintiff to be denied equal protection of the laws and to be deprived of equal privileges and immunities under the laws on account of plaintiff's race by subjecting him to legally unjustified and racially discriminatory detentions and searches, thereby interfering with plaintiff's travel through California and violation of 42 USC Section 1985(3). The supervisory defendants had knowledge of the conspiracy to violate plaintiff's civil rights and of the violations committed, and had power to prevent these wrongs, but neglected or refused to do so in violation of 42 USC §1986.

80.    Defendants' acts were done in knowing violation of plaintiff's legal and constitutional rights, and have directly and proximately caused plaintiff humiliation, mental pain and suffering.

## SEVENTH CAUSE OF ACTION
### VIOLATION OF GOVERNMENT Sections 11135 and 11139

81.    Plaintiff incorporates by reference and reallege paragraph 1 through 80 of

21

Exhibit 1 -  Page 29

this complaint.

82.     Government code section 11135 (a) prohibits race discrimination in any program or activity that is funded directly by the state or receives any financial assistance from the state.

83.     State regulations implementing §11135 provide that no program receiving financial assistance from the state of California shall have an unjustified discriminatory impact or effect on the basis of race.

84.     Defendant LAPD receives financial assistance from the state of California, and thus is bound to abide by the terms of government code §11135 and its implementing regulations.

85.     Eleventh Amendment immunity of the State of California was waived by the state of California and its enactment of amendments to government code section §11139 in the California civil Rights Amendments of 1999.

86.     Defendants City and LAPD's violation of government code §11135 and it's implementing regulations have caused and will continue to cause plaintiff to suffer tremendous harm and public humiliation and that they have been and will continue to be subjected to LAPD's practice of race-based discrimination without judicial intervention.

## EITHTH CAUSE OF ACTION
### Violation of Artical 1, Section 1of the Cak ifornia Constitution
### Violation of article 1, section 7 (a) of the California Constitution.

87.     Plaintiff incorporates by reference and reallege 1 through 86 of this complaint.

22

Exhibit 1 -  Page 30

88.     Defendants as described above conduct, violated plaintiff's rights to be free from unreasonable searches and seizures under Article 1, Section 13 of rights not to be deprived of due process and equal protection of the laws under article 1, section 7 (a) of the California Constitution.

## NINTH CAUSE OF ACTION
### Violation of article 1 section 13 of the California Constitution

89.     Plaintiff incorporates by reference and reallege paragraphs 1 through 88 of this complaint.

90.     Defendants' above-described conduct violated plaintiff's right to be free from unreasonable searches and seizures under article 1, section 13 of the California Constitution.

## TENTH CAUSE OF ACTION
### Violation of civil Code Section 52.1(b)

91.     Plaintiff incorporates by reference and reallege paragraph 1 through 90 of this complaint.

92.     Defendants above described conduct interfered and/or attempted to interfere with plaintiff's exercise and/or enjoyment of their rights as secured by the United States Constitution and/or a California constitution, in violation of California civil code section 52.1.

## ELEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

93. Planintiff incorporates by reference and reallege paragraphs 1 through 92 of this complaint.

94.     Defendants' above-described conduct was extreme and outrageous. Said

23

Exhibit 1 -  Page 31

conduct was done intentionally and with conscious disregard of plaintiff's rights, and directly proximately caused plaintiff humiliation, mental pain and suffering.

## TWELFTH CAUSE OF ACTION
### Negligence Infliction Of Emotional Distress

95.     Plaintiff incorporates by reference and reallege paragraphs 1 through 94 of this complaint.

96.     Defendants above described conduct constituted a breach of defendants' duty of care to Plaintiff to ensure that defendants did not cause unnecessary or unjustified harm to Plaintiff. It was reasonably foreseeable to all defendants that a breach of that duty by defendants would cause emotional distress to Plaintiff

## THIRTEENTH CAUSE OF ACTION
### False Imprisonment

97.     Plaintiff incorporates by reference and reallege paragraphs 1 through 96 of this complaint.

98.     Defendants above-described conduct restrained plaintiff against his will and without legal justification.

99.     Defendants acts were intentional and done in violation of plaintiff's rights, and have directly and proximately caused plaintiff humiliation, mental pain and suffering.

## FOURTEENTH CAUSE OF ACTION
### Declaratory Relief

100. Plaintiff incorporates by reference and reallege paragraphs 1 through 99 of this complaint.

24

Exhibit 1 -  Page 32

101.   There is a real and actual controversy between plaintiff and defendants regarding whether defendants may undertake to act as described herein. Plaintiff contends that defendants violated the United States and California Constitution and the laws of the United States and of California.On information and belief, defendents deny that their conduct violated the United States and California Constitutions and the laws of the United States  and of California.Plaintiff fears that he will again be subjected to such unlawful and unconstitutional actions, and seeks a judicial declaration that defendants conduct deprived plaintiff of his rights under the United States and California Constitution and the laws of the United States and California.

## PRAYER FOR RELIEF

Wherefore, plaintiff pray that the court, as to all defendants' in each of them jointly and serverally:

1.     Issue a declaratory judgment that defendants' conduct as complained herein was a violation of plaintiff's rights under the United States and California ConstitutionS and the laws of the United States and California;

2.     Issue an injunction (a) prohibiting defendants from engaging in vehicular stops or searches based on race or ethnicity; (b) ordering defendants to establish effective preventative mechanisms to ensure that discriminatory traffic stops and vehicular searches do not continue in the future, including but not limited to the following:

(i)to cease and desist from all pretextual stops;

(ii)to cease and desist from all searches without probable cause of criminal activity;

25

Exhibit 1 -  Page 33

(iii) to collect and maintain comprehensive records of all traffic stops in the state of California, including those stops that do not result in the issuance of a citation; and

(iv) to establish a procedure to enable each person involved in a traffic stop the right to file a grievance to contest illegal acts and acts motivated by bias;

(v) to establish clear and consistent discipline in the event a grievance is sustained;

(vi) to establish a civilian complaint review board;

(vii) to appoint an independent auditor who will review the records of officers quarterly to determine that there is compliance with these reforms;

(viii) to establish early warning system which will collect information such as citizen complaints against an officer and other information regarding misconduct and will alert the officer's supervisor when a set number of incidents are recorded;

(ix) to establish a mechanism for internal discipline of officers who are found to have engaged in racial profiling and pretextual stops.; and

(x) to require that all officers participate in regular and recurring training to assure that the officers do not act due to bias based on race or ethnicity.

3.     Award compensatory and general damages against defendants in each of them, for plaintiff in an amount to be determined according to proof at trial;

4.     Award exemplary and punitive damages against all defendants sued in their individual capacities in an amount to be proven at trial;

26

Exhibit 1 -  Page 34

5.      Award statutory damages and penalties pursuant to California civil code section 52 (b);

6.      Award plaintiff their cost, expenses and reasonable attorney fees pursuant to 42 USC 1988, California civil code section 52 (B) and 52.1 (h), and California code of civil procedure section 1021.5; and

7.      Grant such other and further relief as the court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to rule 38b, Federal rules of civil procedure and Rule 3-6, local rules, United States District Court, southern District of California, plaintiff demand trial by jury for all the issues plead here in so triable.

Date: 10-13-20

By: _____

Murad Clark

27

Exhibit 1 -  Page 35

# Exhibit A

Exhibit 1 -  Page 36

Exhibit 1 -  Page 37

1421 Channing St

Channing St

Exhibit 1 -  Page 38

1421 Channing St

Channing St

Exhibit 1 -  Page 39

# Exhibit B

Exhibit 1 -  Page 40



Exhibit 1 -   Page 41



Exhibit 1 -  Page 42

# Exhibit C

Exhibit 1 -  Page 43

LAPD

# Mayor Orders Elite LAPD Unit to Reduce Traffic Stops Amid Calls of Racism

"Let's be very clear. Los Angeles police officers target behavior, not skin color," the LAPPL said in a Jan. 28 blog post.

By City News Service • Published February 7, 2019 • Updated on February 7, 2019 at 9:52 am

  

An elite unit of the Los Angeles Police Department was ordered Wednesday by Mayor Eric Garcetti to reduce the number of vehicle stops it conducts in response to calls from activists and an investigation by the Los Angeles Times that claims officers pulled over a disproportionate number of African Americans.

On Tuesday, the groups, which include the American Civil Liberties Union of Southern California, Children's Defense Fund California, Community Coalition and SEIU Local 99 issued a letter addressed to Garcetti, LAPD Chief Michel Moore and the Police Commission, stating the work of the Metropolitan Division has "led to the incarceration and harassment of African American and Latino people, exacerbating racial and wealth disparities in the city of Los Angeles."

Exhibit 1 -  Page 44

Division officers stop black drivers at a rate more than five times their share of the population, the newspaper reported.

## News
Top news of the day



**3 HOURS AGO**
One-Time Rivals Rajon Rondo and LeBron James Cross Paths on the Brink of Lakers History



**19 MINS AGO**
Palm Springs Aerial Tramway Reopens After Virus Shutdown

Garcetti said he favored policing techniques other than traffic stops to help build trust between black residents and the police department, The Times said.

"I have directed the chief of police to prioritize other elements of our comprehensive crime reduction strategy, beyond vehicle stops, until we learn more, so that we can accelerate the reduction in vehicle stops that has been achieved since they peaked a couple of years ago," Garcetti said in the statement.

"We have made our streets safer with fewer vehicle stops than in recent years, and we have to keep prioritizing what works to both stop crime and strengthen trust."

By 2018, the number of drivers stopped by Metro was nearly 14 times greater than before the expansion, but nearly half the drivers stopped by Metro are black, which has helped drive up the share of African Americans stopped by the LAPD overall from 21 percent to 28 percent since the Metro expansion, in a city that is 9 percent black, according to the newspaper's analysis.

The Los Angeles Police Protective League, the union representing the department's rank and file officers, said the fact the data cannot prove racial profiling should have been the lead of the story.

"Let's be very clear. Los Angeles police officers target behavior, not skin color," the LAPPL said in a Jan. 28 blog post.

Exhibit 1 -  Page 45

analysis" of the LAPD's Metropolitan Division demonstrates the implicit bias some possess against reporting facts, put in the appropriate context, about Los Angeles police officers and how we do our jobs."

The league said the article cherry-picked data to align with a "preconceived false narrative. That false narrative, promulgated by the Times and its deliberate omission of important contextual data, admittedly zero evidence and any semblance of fair analysis, is designed to paint Metropolitan Division officers as racists who randomly stop black drivers. That reckless charge is offensive, it's not true and is one of the worst kinds of lies anyone can tell."

The effectiveness of the strategy is hard to assess: crime continued to rise for several years before dipping in 2018.

Garcetti said last month that the Office of the Inspector General will be conducting an audit of the unit.

"Angelenos deserve to understand the full picture when something outside the ordinary happens with any of our officers," Garcetti said during a news conference at LAPD headquarters that was mostly dedicated to discussing 2018 crime statistics.

The 270 officers who make up the Metro Division focus on vehicle stops and other "proactive" policing tactics intended to root out violent criminals, often using a minor violation in order to question the driver and potentially search the vehicle, the paper said.

"We look forward to meeting with the leaders who make up the Community Coalition to address their concerns identified over strategies we employ to combat violent crime," LAPD spokesman Josh Rubenstein said in a statement.

The data analyzed by The Times does not show why an individual officer pulled over a driver, and does not contain information about whether a motorist was searched, ticketed or arrested after the stop, nor can the data prove that Metro officers are engaged in racial profiling.

Copyright CNS - City News Service

Exhibit 1 -  Page 46

ADVERTISEMENT

CALIFORNIA

# Garcetti orders LAPD to scale back vehicle stops amid concerns over black drivers being targeted





Officers from the LAPD's Metropolitan Division stop drivers and search their vehicles in November 2015.  (Marcus Yam / Los Angeles Times)

By CINDY CHANG, BEN POSTON

By continuing to use our site, you agree to our Terms of S Privacy Policy. You can learn more about how we use coo reviewing our Privacy Policy. Close

**Special Offer**

$1 for 8 weeks

Exhibit 1 -  Page 47

Mayor Eric Garcetti has ordered Los Angeles police to scale **SUBSCRIBE** response to an investigation by the Los Angeles Times showing that an elite unit was pulling over a disproportionate number of African Americans.

In a written statement Wednesday, Garcetti said he is "deeply concerned" about The Times' findings that Metropolitan Division officers stop black drivers at a rate more than five times their share of the population.

Pointing to decreases in homicides and violent crimes last year, Garcetti said that progress in fighting crime needs to come with gains in public trust. He said that reducing vehicle stops, which are perceived by some black residents as racially discriminatory, in favor of other policing techniques will help to build that trust.

"I have directed the Chief of Police to prioritize other elements of our comprehensive crime reduction strategy, beyond vehicle stops, until we learn more — so that we can accelerate the reduction in vehicle stops that has been achieved since they peaked a couple of years ago," Garcetti said in the statement. "We have made our streets safer with fewer vehicle stops than in recent years, and we have to keep prioritizing what works to both stop crime and strengthen trust."

ADVERTISING

By continuing to use our site, you agree to our Terms of S Privacy Policy. You can learn more about how we use co reviewing our Privacy Policy. Close

**Special Offer**

$1 for 6 weeks

Exhibit 1 -  Page 48

On Tuesday, citing the Times investigation, civil rights and c    **SUBSCRIBE**    d on Garcetti to withdraw Metro from South L.A.

The groups, which include the American Civil Liberties Union of Southern California and Community Coalition, are also asking for more youth programs, mental health services and community policing.

"The deployment of the Metropolitan Division has failed to address safety in communities like South Los Angeles, but rather has led to the incarceration and harassment of African American and Latino people," they wrote in a Feb. 5 letter to Garcetti, LAPD Chief Michel Moore and the five-member civilian Police Commission that oversees the LAPD.

Since Garcetti announced in 2015 that Metro would double in size to combat an increase in violent crime, the number of vehicle stops by its officers has skyrocketed from a few thousand to nearly 60,000 last year.

Garcetti and Moore have cited the Metro expansion as a key component in the city's crime fighting strategy.

Unlike regular patrol officers, Metro crime suppression officers, who numbered about 270 last year, often spend their shifts on vehicle stops and other "proactive" policing tactics intended to root out violent criminals.

They typically use a minor violation such as a broken tail light as a starting point to question the driver and potentially get inside the car — a type of stop known as a pretextual stop.

By continuing to use our site, you agree to our Terms of S Privacy Policy. You can learn more about how we use coo reviewing our Privacy Policy  Close

## Special Offer

$1 for 8 week:

Exhibit 1 -  Page 49

Other crime suppression strategies used by Metro include in apprehending suspects involved in violent crime and foot patrols in neighborhoods impacted by street level crime, Rubenstein said.

SUBSCRIBE

"We understand the delicate balance between our enforcement posture and our steadfast commitment to building relationships, engaging the community and enhancing public trust," he said. "Identifying and arresting individuals who are responsible for gun violence remains a top priority as in the days ahead we expand our strategies beyond the typical crime suppression tactics involving vehicle stops in our most violence impacted neighborhoods."

The Times investigation found that nearly half the drivers stopped by Metro were black. That has helped drive up the share of African Americans stopped by the LAPD overall from 21% to 28% since the Metro expansion, in a city that is 9% black.

In South L.A., which is 31% black, 65% of the drivers stopped by Metro were black.

ADVERTISEMENT

Last week, in response to the Times findings, Garcetti called for an audit of Metro stops. A similar audit by the LAPD's Office of Inspector General was already in the works and is expected to be released late this year.

Alberto Retana, president and CEO of Community Coalition, said the Times findings were "gut-wrenching" because they confirmed the feelings of black residents who say that police are targeting them because of their race.

The Times investigation did not prove that officers were engaging in racial profiling, but civil rights advocates have said the disparities a

By continuing to use our site, you agree to our Terms of S Privacy Policy. You can learn more about how we use coc reviewing our Privacy Policy. Close

**Special Offer**

$1 for 8 weeks

Exhibit 1 -  Page 50

"To see that echoed in the L.A. Times is cause for alarm, but **SUBSCRIBE** unity for the LAPD to do something different and change its practices and stop its targeting of African Americans in the city," Retana said.

ADVERTISEMENT

Melanie Ochoa, an attorney with the ACLU of Southern California, said that Metro's mission in South L.A., with officers driving around looking for people who might have guns or drugs, means that "harassment and targeted policing are baked into the way it operates."

Citing a report about the LAPD's Gang Enforcement Details released by the inspector general last week, she questioned whether stopping motorists and pedestrians is an effective way to fight crime. That report found that in more than half the stops examined during a two-month period last summer where people were subsequently searched, the searches may have been unconstitutional.

"They like to claim a straight line from these tactics to a reduction in crime, but we don't know if it's actually borne out in practice," she said.

Steve Soboroff, president of the Police Commission, said he called Retana after receiving the letter and plans to discuss the issue with him.

ADVERTISEMENT

Whether to pull Metro out of South L.A. is beyond his purview as a police commissioner, he said. But he hopes to learn more from Retana about what programs residents need and how to win the trust of those who are suspicious of the police.

By continuing to use our site, you agree to our Terms of S Privacy Policy. You can learn more about how we use co reviewing our Privacy Policy. Close

**Special Offer**

$1 for 8 weeks

Exhibit 1 -  Page 51

Police Commissioner Shane Murphy Goldsmith said she sup **SUBSCRIBE**

policing and youth programs, which she believes will address the root causes of crime.

She said she is not prepared to call for Metro to withdraw from South L.A. until the inspector general releases his findings.

ADVERTISEMENT

CALIFORNIA



## The stories shaping California

Get up to speed with our Essential California newsletter, sent six days a week.

Enter Email Address

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.

   Cindy Chang

🐦 Twitter   📷 Instagram   ✉ Email   f Facebook

Cindy Chang covers the Los Angeles Police Department. She came to The Times in 2012, first covering immigration and ethnic communities before moving to the L.A. County sheriff's beat. Previously, she was at tl

By continuing to use our site, you agree to our Terms of S
Privacy Policy. You can learn more about how we use co
reviewing our Privacy Policy. Close

# Special Offer

$1 for 8 week

Exhibit 1 -  Page 52